Estate of Glenn Stewart, A. B. Davenport, Jr., Administrator, and Mary E. Stewart, Individually v. Commissioner.
Estate of Stewart v. Commissioner
Docket No. 36676.
United States Tax Court
T.C. Memo 1955-107; 1955 Tax Ct. Memo LEXIS 226; 14 T.C.M. (CCH) 356; T.C.M. (RIA) 55107; April 29, 1955
John A. Rowntree, Esq., for the petitioners. Homer F. Benson, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined a deficiency of $153,952.52 in the income tax of Glenn Stewart and Mary E. Stewart for 1943, and an addition to tax of $42,057.42 under section 291(a) of the Internal Revenue Code of 1939 for failure to file a return within the time prescribed by law. Issues presented by the pleadings are the correctness of the respondent's action (1) *227 in failing to accept as correct the books and records maintained for a liquor store known as the Smoky Mountain Liquor Store, (2) in determining total purchases, (3) in determining that total gross receipts from the business were in excess of the amount shown by the books, (4) in failing to make allowances for shrinkage, theft, breakage or shortage in determining total gross receipts, (5) in failing to allow as deductions for business expenses the amounts of $600 and $150 expended for traveling and automobile expenses, (6) in failing to determine that during 1943 the liquor store was operated by a partnership composed of Glenn Stewart and Mary E. Stewart and in which their interests were equal, and (7) in determining that petitioners are liable for an addition to tax under section 291(a) of the 1939 Code. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Glenn Stewart and his wife, Mary E. Stewart, resided in Newport, Cocke County, Tennessee, during 1943. Glenn Stewart died on February 7, 1952, and A. B. Davenport is the duly qualified and acting administrator of his estate. During 1943 Glenn Stewart, sometimes hereinafter referred to *228 as the decedent, operated a liquor store known as Smoky Mountain Liquor Store in Newport, Cocke County, Tennessee, serving customers in North Carolina and eastern Tennessee. Except for Hamilton County, in which the city of Chattanooga is situated, Cocke County was the only county in Tennessee east of Davidson County, in which the city of Nashville is situated, where whisky could be legally sold during 1943. Late in December 1943 Cocke County was "voted dry." Issues (1), (2) and (3). Books and records, total purchases, and gross receipts. Findings of Fact During 1943 the decedent had a checking account designated "Smoky Mountain Liquor Store" with Merchants and Planters Bank of Newport, Tennessee. In the first part of December 1943, decedent requested the Timmons Audit Company, Knoxville, Tennessee, to make an examination of the records maintained for the Smoky Mountain Liquor Store, make an estimate of his income for 1943, and prepare a declaration of estimated income tax for that year.on December 12, 1943, John Tyler, an employee of the company, called at the liquor store and decedent submitted to him, as the records of the business, some checkbook stubs, duplicate bank deposit *229 slips, sales tickets or invoices, purchase invoices and a book designated "Cash Book," which was represented to Tyler as being a record of the sales for the year to that date. No other records were furnished Tyler. Respecting the absence of any record showing cash expenditures, decedent advised Tyler that all expenditures had been made by check. From the records and information furnished him respecting the operations of the liquor store through December 11, 1943, Tyler prepared a statement of receipts and disbursements through December 11, 1943, an estimate of decedent's income for 1943, and a declaration of estimated income tax for that year. After the close of 1943 decedent requested Timmons Audit Company to prepare an income tax return for him and his wife, Mary E. Stewart, for 1943. David Buchanan, an employee of the company, requested decedent to bring all his books and records for 1943 to the office of the company. In response to therequest decedent brought to the office purchase invoices, sales invoices, checkbook stubs, cancelled checks, bank statements and a cash book. Buchanan then made an examination of the records from December 11, 1943, the date through which Tyler had *230 made an examination, to the end of 1943. On the basis of his examination and the statement of receipts and disbursements prepared by Tyler, Buchanan made a computation of the total receipts and disbursements of the liquor store for 1943. Thereupon he prepared an income tax return for decedent and his wife, Mary E. Stewart, for 1943. The return contained a schedule showing the following with respect to the Smoky Mountain Liquor Store: Sales
$1,028,859.03
Cost of goods sold
892,868.40
Gross profit on sales
$ 135,990.63
Total operating expenses
13,192.88
Net profit
$ 122,797.75 The return prepared by Buchanan also contained a schedule showing the following with respect to the Smoky Mountain Club which was located aprpoximately one and one-half miles from the liquor store and was operated by Mary E. Stewart: Sales
$8,748.60
Cost of goods sold
7,890.41
Gross profit on sales
$ 858.19
Total expenses
2,353.17
Net loss
$1,494.98 The difference between the net profit of $122,797.75 shown on the schedule for the liquor store and the net loss of $1,494.98 shown on the schedule for Smoky Mountain Club, $121,302.77, was entered on the return as net *231 profit from business and also as total income. From the latter amount a deduction of $100 was taken for contributions and the remainder, $121,202.77, was entered as the net income subject to tax. On March 15, 1944, decedent called at the office of Timmons Audit Company and remained there about half an hour. During that time Buchanan gave decedent the return which he had prepared, advised decedent that the return would have to be signed before filing, told him the amount of additional tax due, and informed him that payment of such amount should be made when the return was filed. Thereafter, on the same day, the unsigned return, accompanied by a remittance in the amount shown on the return as the additional tax due, was filed with the collector for the district of Tennessee. During 1943 whisky dealers operating as decedent did were required to make a report to the Internal Revenue Service monthly, on Form 52-A, of their purchases during the month and, on Form 52-B, of their sales during the month. They were required to report on Form 52-B, as having been made at wholesale, all sales of whisky made in quantities of 5 or more wine gallons regardless of the prices charged or received. *232 All dealers selling whisky in quantities of 5 or more wine gallons were required to have a Federal wholesale license or permit and were required to report sales on Form 52-B. Reports on Form 52-B filed for Smoky Mountain Liquor Store for 1943 disclose the following with respect to sales by the store during that year: Total gallons
Total gallons
Total gallons
sold at retail
sold at
sold at
and at
retail
wholesale
wholesale
Whisky
15,123.40
49,339.60
64,463.00
Gin
1,672.80
791.00
2,463.80
Brandy
684.20
195.40
879.60
Rum
1,604.80
189.80
1,794.60
Liqueurs
374.70
87.60
462.30
Total
70,063.30
Late in 1944 or early in 1945 Louis E. Ogle, a revenue agent, was assigned to the work of investigating the income tax returns of wholesale and retail liquor dealers and bootleggers. Thereafter and for more than three years, he was engaged in investigating the income tax returns of liquor dealers and bootleggers in eastern Tennessee and in part of middle Tennessee. Because of his investigation, he concluded that after the first few months of 1943 the old and well-known brands of whisky became scarce and were difficult to obtain; *233 that during 1943 certain new brands of whisky called premium brands appeared on the market and frequently were sold in quantity lots ranging from 50 to 300 cases and at prices in excess of the prices shown on the invoices issued to customers; that it was a widespread practice among retailers for whisky to be sold at prices which were at or in excess of a mark-up of 33 1/3 per cent allowed by O.P.A. and that it was a general practice among wholesalers to sell whisky to bootleggers at prices in excess of the legal price to retailers. At, or shortly after, the time Ogle was assigned to the work of investigating the income tax returns of liquor dealers and bootleggers, he began an investigation of the Smoky Mountain Liquor Store for 1943. This investigation, carried on along with a number of other investigations, continued until about November 1947. As a result of his investigation Ogle found that during 1943 purchases had been made in an amount of $13,923.72 in excess of the amount of $863,234.64 shown by the records of the liquor store and used by Buchanan in preparing the unsigned return. Consequently he concluded that the cost of goods sold by the store in 1943 was $906,792.12 or *234 $13,923.72 in excess of the amount of $892,868.40 shown in the unsigned return as the cost of goods sold. Being unable to ascertain from the sales records of the store the amount of sales for the year, and being familiar with the situation and practices prevailing in the liquor business in the area during 1943, Ogle concluded that the sales for the year equaled the amount of the cost of goods sold plus a mark-up of 33 1/3 per cent which in 1943 was allowed by O.P.A. to retail liquor dealers. On that basis he computed the sales at $1,209,056.16 or at $180,197.13 in excess of $1,028,859.03 shown on the unsigned return as the sales. From his investigation he concluded that the total operating expenses of the store for the year amounted to $12,442.88 or $750 less than $13,192.88 shown in the unsigned return as total operating expenses. On the basis of the foregoing Ogle computed the net profit of the store for 1943 to be $289,821.16, or $167,023.41 in excess of the amount of $122,797.75 shown on the unsigned return as the net profit. The deficiency in tax involved herein was determined on the basis of the foregoing amounts arrived at by Ogle. Opinion The petitioners have assigned *235 as error the respondent's failure to find that the books and records maintained with respect to the Smoky Mountain Liquor Store correctly reflected the income from the business for 1943. The respondent has denied the error assigned by petitioners and contends that on the record presented his action should be sustained. The petitioners have put in evidence herein the purchase invoices, sales invoices, checkbook stubs, cancelled checks, bank statements and the cash book which Buchanan testified the decedent submitted to him after he requested decedent to bring in all of his books and records for the purpose of preparing an income tax return for 1943 for the decedent and Mary E. Stewart. The petitioners also have placed in evidence the original deposit slips which were used when deposits were made in the Smoky Mountain Liquor Store account with the Merchants and Planters Bank and duplicate copies of Forms 52-A and 52-B submitted by decedent to Buchanan during the investigation made by Ogle. The parties have stipulated that the purchase invoices, cancelled checks and check stubs of Smoky Mountain Liquor Store show total expenditures of $863,234.64 during 1943 for goods purchased for *236 sale. Ogle found and the respondent has determined that total purchases for the year were in excess of that amount by $13,923.72. The petitioners have submitted no testimony respecting the completeness or accuracy of the records placed in evidence. However, they have put in evidence, as part of a "30-day letter," dated November 7, 1947, a copy of Ogle's report explaining how he arrived at the excess purchases of $13,923.72 found by him. Appearing beneath the explanation is an "Analysis of [$13,923.72"] made in pencil and apparently inserted subsequent to the receipt of the copy of the report by the decedent. The analysis indicates that approximately $9,200 of the increase represented purchases which had been reported in a return for the store for 1942, whether correctly or incorrectly is not indicated. It is not clear from the analysis what the remainder represented. In view of the state of the record and since we can not find from it that the purchases for 1943 were less than the amount determined by the respondent, we sustain his determination in this respect. The petitioners take the position that the cash book, which the decedent submitted to Buchanan, and which was placed *237 in evidence herein, contains a true and accurate record of the sales made by the liquor store during 1943. At the outset it is to be observed that the record is devoid of any evidence as to the circumstances under which the entries in the cash book were made, or as to who made them, or as to the data from which they were made, or as to whether they were made in the regular course of business. Furthermore, there is no testimony by any one as to the correctness of the entries. The cash book contains for each month of 1943 a page with five columns. For all months, except June, August, October and December, the columns are captioned "Date," "Cash Received" or "Money Received," "Over," "Short" and "Date Deposited." The columns on the pages for June, August, October and December have the same captions as the foregoing except that the column captioned "Cash Received" or "Money Received" for the other eight months is captioned "Cash Deposited." Petitioners offer no explanation for the difference in captions and the record affords no basis for determining whether the difference was a result of inadvertance or of design. The sales invoices of the liquor store generally show sales in case lots *238 and generally show the serial numbers of the cases sold. The sales invoices for January, and through February 8, 1943, generally indicate the total price at which a stated number of cases of each brand was sold and the total amount of each sale, irrespective of whether the sale was of a few or of a number of brands. However, the invoices for the remainder of the year rarely show anything respecting the selling price of any brands or show the total of the sale. The petitioners offered no explanation for the change in invoicing made after February 8 and the failure of the invoices after that date to disclose dollar amounts of sales. However, the record indicates a likely reason for the change. The petitioners put an exhibit in evidence to show the percentage mark-up at which sales of certain brands were made during the portion of 1943 prior to February 8. An examination of the exhibit in connection with its supporting sales invoices discloses that on January 5 a sale of 26 cases of various brands was made by the store to Jesse Honeycutt. Included in the 26 cases were 3 cases of "Old Taylor" which were sold at a mark-up of 11 per cent. On January 27 a sale of 25 cases of various brands *239 was made by the store to the same customer. Included in the 25 cases were 2 cases of "Old Taylor" which were sold at a mark-up of 24 per cent. On January 6 a sale of 26 cases of various brands was made by the store to Jesse Honeycutt. Included in the 26 cases were 8 cases of "Golden Wedding" which were sold at a mark-up of 17 1/2 per cent. On January 23 a sale of 13 cases of various brands was made to P. M. Beacon. Included in that sale was one case of "Golden Wedding" which was sold at a mark-up of 27-6/10 per cent. On January 5 a sale of 25 cases of various brands was made by the store to Jesse Honeycutt. Included in the 25 cases were 2 cases of "Calvert's Reserve" which were sold at a mark-up of 17 per cent. On January 25 a sale of 50 cases of various brands was made to the same customer. Included in the 50 cases were 18 cases of "Calvert's Reserve" which were sold at a mark-up of 32 1/2 per cent. On January 5 a sale of 4 1/2 cases of various brands was made to Blue Bird Cafeteria. Included in the sale was one case of "Lord Calvert" which was sold at a mark-up of 15 per cent. On February 2 a sale of 5 cases of different brands was made to Bill Byrne. Included in that sale were 2 *240 cases of "Old Shenley" which were sold at a mark-up of 46 per cent. From the foregoing it is apparent that between the first of January and February 8 sales were being made at frequently and substantially increased mark-ups. In view of this and since a projection of the increases beyond February 8 would result in greatly increased gross profits, decedent doubtless discontinued after February 8, 1943, the previously prevailing practice of showing on the sales invoices the dollars and cents amounts of the sales in order to prevent O.P.A. officers, as well as Internal Revenue officers, from ascertaining too readily what was being done. The total entries in the columns of the cash book captioned "Cash Received," "Money Received" and "Cash Deposited" is $1,028,859.03. Deposit slips from the files of Merchants and Planters Bank show total deposits of $1,028,854.03 during 1943 in the account of Smoky Mountain Liquor Store. The petitioners suggest that, since the total bank deposits were substantially identical with the total of the entries in the cash book, that fact warrants the conclusion that the total of the cash book entries represented the total sales for the year. Obviously that *241 fact does not warrant such a conclusion. The only proper conclusion to be drawn from the situation is that sums substantially equal to the amounts entered in the cash book were deposited in the bank. But that is far from the conclusion that the total sales were the same amount as the total of the book entries or the total of the bank deposits. So far as appears no record was kept in which the sales of the liquor store were recorded daily. The cash book was not such a record. While it contains dates and spaces for such purposes, it was not used for that purpose. There are numerous instances where the sales slips show sales as having been made on certain days but no entries appear in the cash book for the corresponding days. There are a number of instances where as many as four or five days elapsed without any entries being made for them and then an entry of a substantial amount, in several instances in excess of $10,000, would be made for the following day. In the state of the record presented here we are not able to find that the cash book, or cash book and other records of the liquor store, correctly reflected the sales of the store for 1943. The decedent had it within his power *242 to keep, or have kept, records for the liquor store from which the sales could be determined with substantial accuracy. However, for reasons satisfactory to himself, he elected to do otherwise. In the situation before us we can not conclude that the respondent erred in failing to find that the records maintained with respect to the liquor store correctly reflected the income of the store for the year in question. Petitioners contend that, since O.P.A. regulations in 1943 allowed a maximum mark-up for wholesalers of 15 per cent for distilled spirits, 25 per cent for wine, and 20 per cent for cordials, liqueurs and other specialties, and a maximum mark-up for retailers of 33 1/3 per cent for distilled spirits, 50 per cent for wine and 45 per cent for cordials, liqueurs and other specialties, the sales should now be recomputed by applying the foregoing pertinent percentages to the quantities of whiskey, gin, brandy, rum and liqueurs as shown by the liquor store's records as sold at wholesale and at retail, respectively. The recomputation proposed by the petitioners is not warranted by the record. In the first place the record does not show what portion of the total cost of goods sold *243 during the year was applicable to the various kinds of beverages sold at wholesale and at retail. The quantities shown as wholesale sales supposedly represented the total of sales involving quantities of 5 or more gallons. As indicated above the following sales constituting parts of wholesale transactions were made at mark-ups in excess of 15 per cent: January 6, 8 case of "Golden Wedding" at a mark-up of 17 1/2 per cent and January 23, one case of the same brand at a mark-up of 27 6/10 per cent; January 5, 2 cases of "Calvert's Reserve" at a mark-up of 17 per cent and January 25, 18 cases of the same brand at a mark-up of 32 1/2 per cent; January 27, 2 cases of "Old Taylor" at a mark-up of 24 per cent; February 2, 2 cases of "Old Shenley" at a mark-up of 46 per cent. The latter sale was at a mark-up which was not only more than three times the maximum O.P.A. mark-up allowed wholesalers but also was at a mark-up approaching 50 per cent in excess of the minimum O.P.A. mark-up allowed retailers. With sales having been made at such mark-ups prior to February 8 and the records after that date having been kept in such a manner that neither the decedent nor any one else could determine from *244 them the mark-ups at which subsequent sales were made, we can not find that the sales for the year should be computed in the manner proposed by petitioners. The respondent has determined that the total sales of the liquor store for the year are to be computed at an amount equal to the cost of goods sold plus a mark-up of 33 1/3 per cent. The petitioners had the burden of showing that the determination was erroneous. From a consideration of the record as a whole we think they have failed to discharge their burden. Therefore, the respondent's determination is sustained. Issue (4). Allowances for shrinkage, theft, breakage or shortage Opinion In the petition as originally filed the petitioners alleged as error the respondent's failure to make allowance for shrinkage, theft, breakage, or shortage, amounting to 98 cases, in computing total sales. By an amendment to the petition they have increased the amount for which allowance is sought from 98 cases of 2,947.25 gallons or to an amount approximately 10 times that originally alleged. The petitioners' allegations of error were denied by respondent. In support of their position petitioners rely on copies of Form 338 filed monthly *245 with the Internal Revenue Service for the liquor store for 1943. Form 338 for a given month is supposed to be a summary of Forms 52-A and 52-B for the same month. On the copy of the Form 338 for May there is shown as losses 174.60 gallons of liqueur. On the copy of the form for June there is shown as losses 2,530.05 gallons of whisky. On the copy of the form for July there is shown as losses 2.40 gallons of rum and on the form for December there is shown as losses 208.60 gallons of whisky and 31.60 gallons of rum. Aside from the entries appearing on the Forms 338 the petitioners have furnished us no information as to the claimed losses. Form 338 for June shows that the store had 6,638.85 gallons of whisky on hand at the beginning of the month and received on the premises during the month 4,687.80 gallons, making a total of 11,326.65 gallons. Since 2,530.05 gallons, or in excess of 22 per cent of that total, was reported as losses, it would appear that the occurrence of such an unusual loss, if it had been sustained, would have been susceptible of substantiation by evidence independent of Form 338 for the month, or at least susceptible of some explanation as to what it was attributable. *246 Petitioners have furnished neither substantiation nor explanation as to this or any of the other claimed losses. In the situation presented we find no basis for concluding that the respondent erred in the respect complained of by petitioners. Issue (5). Allowance of business deductions In their petition the petitioners assigned as error the failure of the respondent to allow as deductions for business expenses the amounts of $600 and $150 expended for traveling and automobile expenses. In a stipulation filed by the parties the petitioners concede the correctness of the respondent's action. Issue (6). Partnership Findings of Fact Partnership returns were filed for 1941 and 1942 for the business of Smoky Mountain Liquor Store. These returns showed J. T. Voyles, Oscar Miracle, and Mary E. Stewart as partners. As found above, the decedent operated the store during 1943 and employed Timmons Audit Company to prepare an income tax return for that year for him and Mary E. Stewart in which was entered items of income and expenses of both the Smoky Mountain Liquor Store and the Smoky Mountain Club. As found above, the latter was operated by Mary E. Stewart during 1943. The return *247 which had been prepared by Timmons Audit Company was filed unsigned with the collector on March 15, 1944. No partnership return for Smoky Mountain Liquor Store for 1943 was prepared or filed at that time. During 1943 Mary E. Stewart was in the Smoky Mountain Liquor Store on several occasions. Occasionally some of the invoices of goods purchased by the store were addressed to her. In a few isolated instances she signed the decedent's name to checks drawn on the store's bank account. The Forms 52-A, 52-B and 338, heretofore referred to, carried her name in the jurat but purport to have been signed and sworn to by decedent as "Manager." On September 18, 1944, in the District Court of the United States, Eastern District of Tennessee, in a proceeding styled United States of America v. Glenn R. Stewart, Mary Ella Stewart, d.b.a. Smoky Mountain Liquor Store, Newport, Tennessee, decedent and Mary E. Stewart pleaded guilty to engaging in the business of purchasing for resale at wholesale distilled spirits without first having procured a basic permit and selling whisky at a price in excess of the maximum retail price, in violation of Title 27, Section 203(c)(1), U.S.C.A., and for violation *248 of O.P.A. Regulation No. 445 as charged in five counts of an information. Decedent was fined $1,000 on each count or a total of $5,000 and Mary E. Stewart was fined $200 on each count or a total of $1,000. The court ordered both fines to be paid immediately. On May 29, 1951, a partnership return for Smoky Mountain Liquor Store for 1943 showing decedent and Mary E. Stewart as partners sharing equally in the partnership income was filed with the collector. This return was prepared by Buchanan at the request of decedent. The items of income and expenses shown for the store on the partnership return were identical with these shown in the schedule for the store on the unsigned return except that in the partnership return a lesser amount was deducted for depreciation and a correspondingly larger net profit from the business was shown. At or about the same time the partnership return was filed, decedent and Mary E. Stewart filed separate income tax returns for 1943 and separate claims for refund of income tax for that year. These also were prepared by Buchanan. In their separate returns, decedent and Mary E. Stewart showed as income from the Smoky Mountain Liquor Store the amounts shown *249 on the partnership return as their distributive shares. In addition the decedent showed in his return the amount of $1,528.36 as loss sustained by him on the operation of Smoky Mountain Club. The claims were based on the statement that the amounts thereof represented overpayment of income tax paid on joint "Estimated Taxes Returns" and on a joint income tax return filed through error. Subsequent to the filing of the separate income tax returns and claims for refund, the respondent determined the deficiency in tax and addition to tax involved herein and addressed the notice of deficiency to "Mr. Glenn Stewart and Mrs. Mary E. Stewart, Husband and Wife." Thereafter, and subsequent to the filing of the petition herein and answer thereto, the respondent notified this Court that, pursuant to the authority provided by section 273(a) of the Internal Revenue Code of 1939, jeopardy assessment had been made as follows of the deficiency in tax and addition to tax as determined in the deficiency notice: Addition
Income tax
to tax
Estate of Glenn Stewart,
Deceased, A. B. Daven-
port, Jr., and Mary E.
Stewart, Co-Adminis-
trators
$153,952.52
$42,124.92
Mary E. Stewart
153,952.52
42,124.92
*250 Opinion The petitioners contend that during 1943 the Smoky Mountain Liquor Store was operated as a partnership consisting of decedent and Mary E. Stewart with equal interests and that the deficiency in tax here in controversy should be redetermined on the basis of one-half of the net income of the store being taxed to each as reported in the separate returns filed by them in 1951. The respondent takes the position that the evidence bearing on this issue fails to show that during 1943 there was a bona fide partnership existing between decedent and Mary E. Stewart. In Commissioner v. Tower, 327 U.S. 280, which involved the question of whether a bona fide partnership existed between husband and wife, the Court said: "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses. When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing *251 in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.' Drennen v. London Assurance Company, 113 U.S. 51, 56, 5 S. Ct. 341, 344, 28 L. Ed. 919; Cox v. Hickman, 8 H.L. Cas. 268. We see no reason why this general rule should not apply in tax cases where the government challenges the existence of a partnership for tax purposes. * * *" In Commissioner v. Culbertson, 337 U.S. 733, which also involved a family partnership, the Court said: "A partnership is, in other words, an organization for the production of income to which each partner contributes one or both of the ingredients of income - capital or services. Ward v. Thompson, 1859, 22 How. 330, 334, 16 L. Ed. 249. * * *" In the Culbertson case the Court further said that, in determining whether a bona fide partnership exists, the basic question is: "whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested *252 persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" Respecting the question of whether services or capital furnished by the alleged partner are of sufficient importance to justify his inclusion in the partnership, the Court further said in the Culbertson case: "If, upon a consideration of all the facts, it is found that the partners joined together in good faith to conduct a business, having agreed that the services or capital to be contributed presently by each is of such value to the partnership that the contributor should participate in the distribution of profits, that is sufficient. * * *" From a careful consideration of all the evidence bearing on the question in the light of the foregoing statements of the Supreme Court, we are unable to find that during 1943 a partnership existed between decedent and Mary E. Stewart with respect to the Smoky Mountain Liquor Store. *253 The evidence indicates that prior to 1943 the liquor store was operated by a partnership composed of Mary E. Stewart and two others, neither of whom was decedent. While the record is silent as to how or under what circumstances the decedent acquired the store and business, it does show that he operated it during 1943. And, so far as shown, he operated it with his own funds and without any contribution of capital or any substantial services by Mary E. Stewart. The petitioners have submitted no evidence directed to any agreement, either oral or written, between the decedent and Mary E. Stewart respecting the operation of the store as a partnership. Decedent died prior to the hearing and was not available to testify respecting any possible partnership agreement. However, the evidence shows that at the time of the hearing Mary E. Stewart was employed in Knoxville, Tennessee, where the proceeding was heard. Although she is a petitioner herein, she did not appear as a witness. When the proceeding was first called for hearing, counsel for the petitioners stated that she was sick. At the request of counsel for the petitioners the proceeding was continued to the following day. Hearing began *254 as continued and continued tinto the next day. No statement was made on either of the latter two days respecting the then failure of Mary E. Stewart to testify. Obviously, if any partnership agreement had been entered into between her and the decedent, she would have known its provisions and also would have known what she and the decedent did in the execution of those provisions. Except for the partnership return for the store for 1943, the separate returns of decedent and Mary E. Stewart for 1943, and the claims for refund, the record is silent as to any statements made at any time by either the decedent or Mary E. Stewart indicating that a partnership existed between them. But the returns and claims were filed in May 1951. This was more than seven years after the close of the taxable year 1943. It also was more than three and one-half years after a 30-day letter, transmitting a copy of Ogle's report of his investigation of their tax liability for 1943, indicating an additional tax due in the amount of the deficiency in tax involved herein, had been sent to them. The fact that in September 1944 the decedent and Mary E. Stewart pleaded guilty to a charge that they, doing business as *255 the Smoky Mountain Liquor Store, had violated certain Federal laws relating to distilled spirits and price control does not aid petitioners since the record fails to show that the violations occurred during the taxable year before us. In fact, the record throws no light on when the violations occurred. The petitioners offered no testimony by any person, either interested or disinterested, to the effect that during 1943 the liquor store was operated, or was regarded as being operated, as a partnership. The unexplained use of Mary E. Stewart's name on certain forms relating to the receipt and disposition of distilled spirits which were signed and sworn to by decedent and filed with the Internal Revenue Service does not under the circumstances indicate the existence of a partnership. The same is true with respect to the unexplained invoicing to Mary E. Stewart of certain occasional purchases of merchandise made by the liquor store and of the unexplained isolated instances when she signed decedent's name to checks. In view of what has been said above we find no error in the respondent's failure to determine that during 1943 the liquor store was operated as a partnership. Issue (7). Addition *256 to tax Opinion The petitioners contend that the record shows that the return filed on March 15, 1944, for 1943 was filed without signing because of oversight and not because of any willful neglect or fraudulent intent; that the Commissioner usually sends notices to taxpayers who have not signed their returns affording them an opportunity to stop the running of the addition to tax, but that such was not done in this case; and that, accordingly, the respondent erred in determining the addition to tax involved herein. The respondent takes the position that the unsigned return was not a return within the contemplation of the Code; that the petitioners have not shown that failure to file a timely return was due to reasonable cause and not due to willful neglect; and that, therefore, his determination of the addition to tax should be sustained. Pertinent portions of the Internal Revenue Code of 1939 are set out below. [1]
*257 Section 51(a) of the Code provides that returns of individuals "shall contain or be verified by a written declaration that it is made under the penalties of perjury." The unsiged return in question contained, immediately preceding spaces for signatures, the following: "I declare under the penalties of perjury, that this return (including any accompanying schedules and statements) has been examined by me and to the best of my knowledge and belief is a true, correct, and complete return." Since the return was not signed and since it was not otherwise verified by a written declaration that it was made under the penalties of perjury, it is apparent that it was not verified as required by the Code. Section 239 of the Revenue Act of 1918 required returns of corporations to be verified under oath by certain designated officers of the corporation. In Lucas v. Pilliod Lumber Co., 281 U.S. 245, affirming 7 B.T.A. 591, the Supreme Court held that an unsigned return filed by the taxpayer which was not verified as required by law, was not the return required by law and was insufficient to start the running of the statute of limitations. Section 51 of the Revenue Act *258 of 1934 required that the returns of individuals be verified under oath. In Theodore R. Plunkett, 41 B.T.A. 700, affd. 118 Fed. (2d) 644, the taxpayer through inadvertence failed to sign and swear to his return for 1934 which was received by the collector on March 18, 1935. Thereafter the respondent determined a deficiency in tax, and an addition to tax for delinquency, against the taxpayer. After petition had been filed with the Board and issues joined, the taxpayer on October 8, 1938, prepared and properly executed a return for 1934 which was filed with the collector on October 10, 1938. It was there held that the unsigned return which was received by the collector on March 18, 1935, was not the return required by law and that the filing of a properly executed return in October 1938 was insufficient to avoid the imposition of the addition to tax for delinquency. In affirming the action of the Board, the Circuit Court of Appeals said: "We have seen that the 'return required by this title' was not filed within the time prescribed by law or by the Commissioner in pursuance of law. If no such return was made the 25 percent penalty is mandatory. Noteman v. Welch, 1 Cir., 1939, 108 Fed. (2d) 206, 215; *259 Helvering v. Boekman, 2 Cir., 1939, 107 Fed. (2d) 388, 389, 390. If such return was filed after the time prescribed by law the penalty is mandatory unless it is shown 'that the failure to file it was due to reasonable cause and not due to willful neglect.' Sabatini v. Commissioner of Internal Revenue, 2 Cir., 1938, 98 Fed. (2d) 753, 756. In this case it can make no difference since even if the properly executed return filed October 10, 1938, can be considered as a proper return filed after the time required by law, the petitioner made absolutely no showing that the failure to file a properly executed return within the time required by law was due to reasonable cause. * * *
"Even if the return filed on October 10, 1938, be considered a proper return for 1934 filed after the time required by law, the penalty must still be imposed on the entire deficiency. The petitioner presented absolutely no evidence why the return mailed on March 15, 1935, was not properly executed. He, therefore, did not bear the burden of showing that his failure to file a proper return in the time required by law was due to reasonable cause. Cf. Berlin v. Commissioner of Internal Revenue, 2 Cir., 1932, 59 Fed. (2d) 996, *260 certiorari denied, 1932, 287 U.S. 642, 53 S. Ct. 90, 77 L. Ed. 555. That the failure was due to inadvertence does not relieve the petitioner from the imposition of the penalty. The penalty is not primarily punitive in nature, but is an attempt to protect the revenue. See, Helvering v. Mitchell, 1938, 303 U.S. 391, 401, 58 S. Ct. 630, 82 L. Ed. 917. In order to escape the penalty, the petitioner must show reasonable cause for his failure to file a proper return; inadvertence is not sufficient." * * *
In view of what has been said above we hold that the return in controversy herein was not a return required by law. The evidence shows that on March 15, 1944, Buchanan who had prepared the return gave it to decedent and advised him that it would have to be signed before filing. Thereafter, on the same day, the return was filed without having been signed. The record is silent as to why the advice given by Buchanan was not followed. In such a state of the record we are unable to find that failure to file a return required by law within the time prescribed by law was due to reasonable cause and not due to willful neglect. Accordingly, the respondent's determination *261 of the addition to tax is sustained. At the hearing, counsel for the petitioners took the position that the only basis on which the respondent could determine a deficiency against petitioner Mary E. Stewart was that during 1943 Smoky Mountain Liquor Store was operated as a partnership of which she was a member. Since admittedly the respondent had made no determination to that effect and at the hearing took the position that during 1943 the store was not operated by a partnership and that, therefore, she was not a member of a partnership which operated the store during that year, counsel for the petitioners moved twice for judgment in her favor. The motions were denied. The record indicates that the respondent has determined the deficiency in tax and addition to tax here in controversy against the decedent and Mary E. Stewart jointly. Since no issue was presented with respect to this action of respondent and since no question, other than that raised by the above-mentioned motions, has been raised with respect to it, we make no determination as to the correctness of such action. Decision will be entered for the respondent. Footnotes
1. SEC. 51. INDIVIDUAL RETURNS. (a) Requirement. - The following individuals shall each make a return, which shall contain or be verified by a written declaration that it is made under the penalties of perjury, stating specifically the items of his gross income and the deductions and credits allowed under this chapter and such other information for the purpose of carrying out the provisions of this chapter as the Commissioner with the approval of the Secretary may by regulations prescribe - * * *
(2) Every individual who is married and living with husband or wife, if no joint return is made under subsection (b) and if - (A) Such individual has for the taxable year a gross income of $1,200 or over, and the other spouse has no gross income; or (B) Such individual and his spouse each has for the taxable year a gross income and the aggregate gross income is $1,200 or over. (b) Husband and Wife. - In the case of a husband and wife living together the income of each (even though one has no gross income) may be included in a single return made by them jointly, in which case the tax shall be computed on the aggregate income, and the liability with respect to the tax shall be joint and several. * * * SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3612(d)(1).↩